# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MICHAEL S. PEDEN,**

    **Plaintiff,**

    **v.**                              **Case No. 20-CV-1307**

**CITY OF MILWAUKEE, et al.,**

    **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

Michael S. Peden, a former acting lieutenant for a medical unit of the Milwaukee Fire Department ("MFD"), sues the City of Milwaukee (the "City"); the County of Milwaukee (the "County"); former City Attorney Grant F. Langley; MFD Chiefs Mark A. Rohlfing and Aaron D. Lipski; former Assistant MFD Chief Gerard Washington; MFD employees Aleah Ellis ("Ellis") and Captain Sharron P. Purifoy; Milwaukee Police Department ("MPD") employee Billie Ellis ("Officer Ellis"); and MPD Captain Raymond S. Banks, under 42 U.S.C. § 1983 and Wisconsin state law for allegedly violating his rights under the Constitution and state law. (Compl., Docket # 1.)

All of the defendants, divided into three separate groups, move for summary judgment in their favor. The City, along with Rohlfing, Langley, Purifoy, Washington, Banks, Lipski, and Officer Ellis (hereinafter referred to collectively as the "City Defendants") move for summary judgment as to Peden's claims against them. (Docket # 68.) Aleah Ellis moves for summary judgment as to the claims against her. (Docket # 57.) And finally, the County moves for summary judgment in its favor as well. (Docket # 62.)

For the reasons further explained below, the defendants' motions for summary judgment are granted and the case is dismissed.

## FACTS

Peden was employed by the MFD from July 26, 2010 through June 17, 2020. (City Defs.' Proposed Findings of Fact ("City DPFOF") ¶ 3, Docket # 72 and Pl.'s Resp. to City DPFOF ¶ 3, Docket # 78.) From July 26, 2010 to May 24, 2014, Peden worked as a firefighter/paramedic. (*Id.*) From May 25, 2014 until June 17, 2020, he worked as a Heavy Equipment Operator, performing at times as an acting Lieutenant. (*Id.*)

The background of Peden's claims relate to Aleah Ellis, who became a firefighter in November 2016. (Declaration of Brianna J. Meyer ¶ 3, Ex. A, Deposition of Aleah Ellis ("Ellis Dep.") at 6, Docket # 60-1.) During her probationary, or "cub" year, at the MFD, Ellis was stationed at MFD Engine 26, MED 3. (City DPFOF ¶ 7 and Pl.'s Resp. ¶ 7.) When Ellis first began at Engine 26, her direct supervisor was Captain Steve Pokora. (Ellis Dep. at 7, 10.) During a firefighter's probationary year, she is supposed to receive monthly evaluations; however, Ellis did not recall receiving one every single month in her first year. (*Id.* at 10.) Probationers are evaluated on a scale of one to five in various categories, including knowledge, skills, and abilities, quality of work, and work habits, among others. (Defendant Ellis' Proposed Findings of Fact ("Ellis PFOF") ¶ 12, Docket # 59 and Pl.'s Resp. to Ellis PFOF ¶ 12, Docket # 83.) Ellis testified that on her first three evaluations, conducted by Captain Pokora, her scores were in the threes or fours. (Ellis Dep. at 11.)

Throughout her time with Engine 26, Ellis alleges that she was subjected to various forms of harassment, including name-calling, racial slurs, and hazing. (City DPFOF ¶ 9.) In May 2017, Peden transferred to MFD Engine 26, MED 3, where he was an acting

2

Lieutenant. (City DPFOF ¶ 4 and Pl.'s Resp. ¶ 4.) After he transferred, Peden became Ellis' direct supervisor and was responsible for conducting her monthly evaluations. (*Id.* ¶ 8.) Peden assisted in drafting a probationary report for Ellis in July 2017. (*Id.* ¶ 9.) On the July evaluation, Ellis received scores of mostly threes, with a couple of twos. (Declaration of Katherine A. Headley ("Headley Decl.") ¶¶ 3, 15, Ex. 1, Deposition of Michael S. Peden ("Peden Dep.") and Ex. 13, Ex. 3 to Peden Dep., Docket # 69 and 69-13.) Peden also performed Ellis' August evaluation, which was reviewed on September 14, 2017. (Ellis PFOF ¶ 19 and Pl.'s Resp. ¶ 19.) Peden called Ellis into his office when the rest of the Engine was out of the station to discuss the evaluation. (*Id.* ¶¶ 20–21.) Peden had given Ellis all ones and twos on the evaluation, and upon seeing the scores, Ellis began crying. (*Id.* ¶¶ 22–23.) Ellis alleges that she asked Peden how she could get better scores and that Peden instructed her to follow him. (*Id.* ¶ 24.) Ellis alleges that Peden called her a "piece of shit" and then sexually assaulted her. (*Id.* ¶ 25.) Ellis alleges that a second incident of sexual assault occurred on September 20, 2017. (*Id.* ¶ 26.) Peden maintains that he did not sexually assault Ellis at any time. (*Id.* ¶ 27.)

During a recruitment event at the police and fire academy in September 2017, Ellis spoke with Assistant Chief Brian Smith about her concerns regarding her treatment at Engine 26. (City DPFOF ¶ 23 and Pl.'s Resp. ¶ 23.) Ellis had previously spoken about these concerns with then-Assistant Chief Brian Schwengel. (*Id.* ¶ 24.) On October 3, 2017, Ellis reported the incidents of non-sexual harassment to then-Assistant Chief Washington. (Ellis PFOF ¶ 29.) Specifically, she made various individual complaints about her colleague's behavior, including reporting that Peden treated her poorly on runs and in quarters, made both sexist and racist comments, called her a "piece of shit cub," ordered her to cook all day

3

despite her medical issues, and yelled at her in front of the entire crew. (*Id.* ¶ 30.) Ellis did not, however, report the alleged sexual assaults. (*Id.* ¶ 31.) Washington initiated a MFD investigation into the harassment allegations in October 2017. (*Id.* ¶ 32.)

After reporting the allegations of harassment, Ellis was temporarily transferred to Engine 38, MED 19, Captain Purifoy's firehouse, and Peden was placed on paid suspension effective October 3, 2017. (*Id.* ¶¶ 34–35.) Captain Purifoy had been one of Ellis' cadet instructors in 2014 and 2015. (Ellis. Dep. at 8; Ellis PFOF ¶ 38.) On October 26, 2017, Ellis had another meeting with Assistant Chief Washington, but this time she was accompanied by Captain Purifoy. (Ellis PFOF ¶ 36 and Pl.'s Resp. ¶ 36.) Also present at the October 26 meeting were Assistant Chief Dave Votis and Debra Webber. (*Id.* ¶ 40.) Ellis testified that she was not at all prepared for what took place at the meeting; she described going through a four-hour meeting with a panel of people, getting interrogated about what happened. (*Id.* ¶ 50.)

At a certain point during the October 26, 2017 meeting, Ellis and Captain Purifoy were left alone in the meeting room. (*Id.* ¶ 42.) The recording device in the meeting room was left on during this time. (*Id.* ¶ 43.) While alone in the meeting room, Captain Purifoy and Ellis had a brief conversation. (*Id.* ¶ 44.) Captain Purifoy told Ellis to describe the environment as "hostile" because "that's exactly what it was." (*Id.* ¶¶ 45–46.) Captain Purifoy also testified that she told Ellis that she wished she would have prepared her for the interview because she knew it would be emotional having to relive her experience. (*Id.* ¶¶ 47–48.) Ellis testified that she replied to Captain Purifoy's comment about preparation with "I wish you would have." (*Id.* ¶ 49.) Ellis did not disclose the alleged sexual assaults by Peden during the October 16, 2017 meeting. (*Id.* ¶ 52.) Ellis testified that she chose not to

4

report the alleged sexual assaults at that time because she was embarrassed, amongst other reasons. (*Id.* ¶ 53.) Thus, at the time Assistant Chief Washington initiated the internal investigation, he was unaware of the sexual assault allegations against Peden. (*Id.* ¶ 54.)

While the Milwaukee Fire Department was conducting its internal investigation, Chief Rohlfing received three anonymous letters at his private residence. (*Id.* ¶¶ 99–100.) Collectively, the letters expressed disgust for the conduct targeted at Ellis, certain members of Engine 26, and the reputation of those firefighters. (*Id.* ¶ 101.) Ellis asserts that she did not author any of the anonymous letters and does not have any knowledge of who did author them. (*Id.* ¶ 102.)

Around Thanksgiving 2017, Ellis disclosed the alleged assaults to fellow firefighter Jason Strzelecki, who Ellis was dating at the time. (*Id.* ¶¶ 10, 62.) Strzelecki called Ellis' mother, Officer Ellis, around December 1, 2017 and informed her about the alleged assaults. (*Id.* ¶ 61.) After speaking to Strzelecki, Officer Ellis spoke to Captain Banks, Officer Ellis' superior, and Officer Banks told her that Ellis would have to report any crime. (*Id.* ¶¶ 63–65.) Officer Ellis told Captain Banks that Ellis was reluctant to come forward, so Banks suggested that they reach out to someone Ellis was close with to determine whether Ellis wanted to report the alleged crimes. (*Id.* ¶ 66.) Captain Banks and Officer Ellis eventually agreed to contact Captain Purifoy. (*Id.* ¶ 67.) Captain Banks called Captain Purifoy the night of December 1, and Captain Purifoy agreed to speak to Ellis. (*Id.* ¶¶ 68–69.)

Thus, on December 1, 2017, Ellis received a phone call from Captain Purifoy. (*Id.* ¶ 57.) Ellis asserts that Captain Purifoy told her that she had heard that Peden was bragging about sexual relationships with Ellis in the firehouse (*id.* ¶ 58); however, unbeknownst to Ellis, Purifoy's call was not based on any bragging by Peden (*id.* ¶ 60). Captain Purifoy told

5

Ellis that if Ellis did not inform her mother, Officer Ellis, what was going on, Captain Purifoy would inform her. (*Id.* ¶ 59.) After receiving Captain Purifoy's phone call, Ellis called Officer Ellis and disclosed that she had been sexually assaulted. (*Id.* ¶ 71.) On the morning of December 2, 2017, Officer Ellis and Ellis drove together to the academy to report the alleged assaults. (*Id.* ¶ 75.) Captain Banks arranged for Detective Steve Wells from the Sensitive Crimes Division to speak with Ellis. (*Id.* ¶ 78.) During the interview, Ellis told Wells that she had been subjected to various forms of harassment while at Engine 26, and, ultimately, Peden sexually assaulted her twice while on the job. (*Id.* ¶ 81.)

After the interview, Wells told Captain Banks that there was enough probable cause to arrest Peden. (*Id.* ¶ 89.) The Honorable Robert Webb Jr. of the Milwaukee County Circuit Court reviewed Detective Wells' determination and found probable cause to arrest Peden. (*Id.* ¶ 92.) Judge Webb ordered a $20,000.00 cash bail for Peden. (*Id.* ¶ 93.) Later that day, the Washington County Sheriff's Department arrested Peden at his home and a prisoner exchange occurred at the border of Washington and Milwaukee Counties. (*Id.* ¶¶ 94–95.) Peden was taken to the Milwaukee County Jail. (*Id.* ¶ 96.)

While at the Milwaukee County Jail, Peden was placed on suicide watch. (*Id.* ¶ 97.) Peden remained on suicide watch from December 3 until December 7, 2017. (County Defendants' Proposed Findings of Fact ("County DPFOF") ¶ 28, Docket # 65 and Pl.'s Resp. ¶ 28, Docket # 74.) It was a common practice for any inmate that was brought into the Milwaukee County Jail with a position of employment in the public eye, such as a firefighter, who was charged with sexual assault which was being reported in the media, to be placed on protective custody or suicide watch. (*Id.* ¶ 32.) Indeed, Peden's initial evaluation conducted by psychiatric social worker John Sullivan on December 3 noted that

6

Peden was "presenting polite, clear and coherent, and thought and speech, AOx4 with stable mood and affect. PT denies current SI/SH." (County DPFOF ¶ 33 and Pl.'s Resp. ¶ 33.) It also noted that Peden was "a high profile case and has been placed on SW per security." (*Id.*) On December 7, 2017, Peden was charged with one count of second-degree sexual assault. (Ellis PFOF ¶ 103.) On December 18, 2017, a preliminary hearing was held; the court made a finding of probable cause and bound the case over for trial. (*Id.* ¶ 104.) Detective Wells provided testimony on which the court made the probable cause determination. (*Id.* ¶ 105.)

Around January 12, 2018, Milwaukee County Assistant District Attorney Erin Karshen advised the MFD not to re-interview Ellis as it pertained to Peden's criminal charges. (Pl.'s Proposed Finding of Additional Facts ("PPFAF") ¶ 17, Docket # 78 and Defs.' Resp ¶ 17, Docket # 92.) City of Milwaukee Assistant City Attorney Jenny Yuan instructed ADA Karshen that Ellis would not be reinterviewed regarding the criminal allegations and that the MFD internal investigation "will thus be held open pending the criminal matter, because the internal investigation cannot continue without the investigator interviewing the complainant about the allegations." (*Id.* ¶ 18.) After Peden was arrested, Washington conducted re-interviews of the Engine 26 members to enquire about Ellis' sexual assault allegations. (*Id.* ¶ 19.) Washington made each interviewee complete another Truth Statement during this second round of interviews. (*Id.* ¶ 20.) Washington closed each interview with another warning to not speak with anyone, except for a union representative, about the investigation while it is ongoing. (*Id.* ¶ 21.) In the second round of MFD interviews conducted by Washington, no interviewee corroborated Ellis' allegations of sexual assault. (*Id.* ¶ 22.)

7

One interviewee stated he would be interested in speaking with Peden's criminal defense counsel but that he could not do so without "getting the green light" from the MFD. (*Id.* ¶ 23.) Washington asked this interviewee to explain what he would say to Peden's criminal defense counsel, to which he responded with information that would undermine Ellis' allegations against Peden, including Ellis oftentimes jokingly threatening to make "one call" to get co-workers fired for no reason. (*Id.* ¶ 24.) Between April 2019 and May 2019, while criminal charges against Peden were still pending, MPD detectives from the Internal Affairs division were allowed to interview approximately fifteen MFD firefighters about Ellis' sexual assault allegations against Peden. (*Id.* ¶ 25.) The fifteen interviews conducted by MPD Internal Affairs were recorded. (*Id.* ¶ 26.)

On April 29, 2019, Peden's criminal defense counsel filed a motion with the Milwaukee County Circuit Court, arguing counsel had yet to receive copies and reports from the interviews. (*Id.* ¶ 27.) Peden's criminal defense attorney then moved to dismiss the criminal charges, raising several constitutional issues, including the inability to gain access to the MFD members' interviews. (County DPFOF ¶ 108; PPFAF ¶ 28.) The court denied the motion to dismiss. (PPFAF ¶ 28 and Defs.' Resp. ¶ 28.)

On June 3, 2019, the Milwaukee County Circuit Court ordered the City to have witnesses available for counsel, reasoning that not having witnesses available to counsel would "certainly infringe upon the due process rights of the defense while continuing the city's interviews." (*Id.* ¶ 71.) On July 11, 2019, the State moved to dismiss the charge against Peden without prejudice. (County DPFOF ¶ 108.) Before moving to dismiss the charges, the assistant district attorney met with Ellis, Ellis' attorney, Officer Ellis, and members of Internal Affairs. (*Id.* ¶ 109.) The assistant district attorney stated that the State could go

8

forward with the trial, but that Ellis would be "persecuted on the stand" and they felt it was best not to go forward. (*Id.* ¶ 110.) Officer Ellis suggested the option of delaying the prosecution, but Ellis was tired and wanted everything to be over with. (*Id.* ¶ 111.) Peden returned to work with the MFD on July 23, 2019. (*Id.* ¶ 120.)

While the criminal charges against Peden were dismissed, the MFD investigation remained pending. (*Id.* ¶ 113.) Although Peden denies the allegations, upon completion of the internal investigation, the MFD found ample evidence to support a number of Ellis' complaints; specifically, that Ellis was exposed to varying degrees of harassment by Peden and other members of her crew. (*Id.* ¶ 115.) Regarding Ellis' allegations that Peden made racist and sexist comments, Chief Lipski found "some evidence" to support the claim, although the degree of severity alleged could not be proven. (*Id.* ¶ 116.) On June 17, 2020, Peden was terminated from the MFD for refusing to follow orders. (*Id.* ¶ 120.) Assistant Chief Lipski officially closed Peden's investigation on October 14, 2020. (*Id.* ¶ 114.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Peden brings seven causes of action against the County, the City Defendants, and Ellis under § 1983 and Wisconsin state law. I will address the claims against each group of defendants in turn.

### 1.    *Claims Against the County*

Peden sues the County in Count Four for denial of due process and in Count Six for malicious prosecution. The County moves for summary judgment in its favor as to both of these claims.

#### 1.1    Malicious Prosecution Claim

As to Peden's claim that the County maliciously prosecuted him (Count Six), the County argues that the employees of the Milwaukee County District Attorney's office who

were involved in Peden's criminal prosecution are not employed by Milwaukee County; rather, they are employed by the State of Wisconsin. (Docket # 63 at 8.) In *Brown Cnty. Att'ys Ass'n v. Brown Cnty.*, the Wisconsin Court of Appeals explained that: "Prior to January 1, 1990, assistant district attorneys were employees of the county in which they worked. On January 1, 1990, the assistant district attorneys became state employees under ch. 978, Stats." 169 Wis. 2d 737, 740, 487 N.W.2d 312, 313 (Ct. App. 1992). Peden does not dispute that the employees of the Milwaukee County District Attorney's Office who were involved in the criminal prosecution of Peden were not employed by the County but were employees of the State of Wisconsin. (County DPFOF ¶ 47 and Pl.'s Resp. ¶ 47.) Furthermore, Peden does not address the County's argument for dismissal of Count Six against the County. (Docket # 73.) For these reasons, the County's motion for summary judgment as to Count Six is granted.

### 1.2  Due Process Claim

In Count Four, Peden alleges the County denied him due process under § 1983 by placing him on suicide watch for five days without justification and for vindictive purposes. (Compl. ¶ 92.) To succeed on a claim under § 1983, Peden must prove: (1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016). A municipality may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability. *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). Rather, the Supreme Court held in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) that plaintiffs may sue municipalities under 42 U.S.C. § 1983 when their actions violate the Constitution. In order to succeed on a *Monell* claim, a plaintiff must ultimately prove three

elements: (1) an action pursuant to a municipal policy; (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury. *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

For pretrial detainees such as Peden, the Supreme Court has held that when "evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* The *Bell* Court made clear, however, that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," noting that such conditions as lack of privacy, loss of freedom of choice, and general restriction of movement are simply "inherent incidents of confinement" rather than punishment. *Id.* at 537. The Court stated that the "fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id.* Thus, to distinguish between unconstitutional punitive measures that may not be imposed prior to an adjudication of guilt and regulatory restraints that may, the Court has traditionally applied the following test:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional

aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

*Id.* at 537–38 (internal quotation and citation omitted). "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* (internal citation omitted).

It is undisputed that it was common practice for an inmate brought into the Milwaukee County Jail with a position of employment in the public eye, who was charged with sexual assault which was being reported in the media, to be placed on protective custody or suicide watch. (County DPFOF ¶ 32 and Pl.'s Resp. ¶ 32.) And it is further undisputed that it was Peden's "high profile case," not his mental health, that placed him on suicide watch. (Declaration of William Duckert, Ex. A, Docket # 64.) Psychiatric social worker John Sullivan conducted a "Mental Health—Initial Evaluation" of Peden on December 3, 2017. Sullivan's evaluation showed Peden's mental status examination was normal. (Docket # 64-1 at 2–4.) Peden denied having suicidal ideation, suicidal intent, or a suicidal plan. (*Id.* at 4.) When Peden asked Sullivan why he was being placed on suicide watch, Sullivan explained that because Peden's was a "high profile case," he was being placed on suicide watch for security. (*Id.* at 5.)

13

Again, in *Bell*, I must first consider whether there was an express intent to punish on the part of the detention facility officials. *See* 441 U.S. at 538. The only evidence Peden cites in support of the jail officials' alleged express intent to punish is his testimony that multiple correctional officers told him that they had orders to place him on suicide watch despite Peden's insistence that he was in good mental health. (Docket # 73 at 6.) But this does not show an intent to punish; it merely indicates that the correctional officers were following the jail's policy of placing "high profile" inmates on suicide watch. Absent a showing of an expressed intent to punish, the *Bell* Court states that the determination will generally turn on whether the "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." 441 U.S. at 539.

The County argues that it had the legitimate governmental interest in protecting Peden and thus placing him on suicide watch was not an unconstitutional punishment. (Docket # 63 at 16.) An inmate's safety is indeed a legitimate governmental interest. The *Bell* Court has stated that "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry." 441 U.S. at 547. The County has presented evidence that the Milwaukee County Jail's inmate classification procedure has the stated purpose of ensuring the "safe, humane treatment of inmates." (Declaration of Brent G. Eisberner ¶ 6, Ex. 4, Docket # 75-4.) And any inmate considered "high risk" cannot go directly into general housing. (*Id.*)

Peden argues that the County's policy does not serve the legitimate interest of protecting Peden because he was not, in fact, suicidal. (Docket # 73 at 11.) It appears that the jail had a common practice of placing high profile, yet non-suicidal inmates on either

14

suicide watch or in protective custody. (County DPFOF ¶ 32 and Pl.'s Resp. ¶ 32.) Former

House of Corrections Employee Scott Sobek testified as follows:

> [I]t was very common practice for any inmate that was brought into the Milwaukee County Jail with a position or -- of employment that was in the public eye, such as firemen, police officers, any type of alderman, anything like that, with a -- with a charge such as sexual assault, rape, murder, what have you, that would make the news, to be placed on protective custody, suicide watch, what have you.

(Affidavit of Vicki L. Arrowood ¶ 5, Ex. D, Deposition of Scott J. Sobek ("Sobek Dep.") at

23, Docket # 66-4.) Sobek testified that "protective custody" means "isolation for an

inmate" and is done "because there might be a threat from other inmates" to that inmate's

safety. (*Id.* at 12, 14.) Sobek testified that "suicide watch" places an inmate in separate

housing to serve the purpose of protecting that inmate from harming himself. (*Id.* at 14.)

Thus, in either circumstance, the inmate is isolated from the general population for his own

protection (*Id.* at 12, 14.) While it is unclear under what circumstances the jail uses suicide

watch as opposed to protective custody to safeguard a high-profile inmate (as the inmate's

actual mental health state does not appear to always be the deciding factor), the jail's

purpose in separating the high-profile inmate from the general population is that inmate's

safety. Perhaps in Peden's case the jail should have isolated him from the general

population through protective custody instead of suicide watch. But even if the jail

misclassified Peden's security status, "[i]nmates generally have no constitutionally protected

liberty interest either in avoiding a particular security classification, or being assigned to any

particular security classification." *Stuck v. Aikens*, 760 F. Supp. 740, 745 (N.D. Ind. 1991)

(internal citations omitted); *see also Earl v. Racine Cnty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013)

("Regardless of why [plaintiff] was placed on suicide watch, the district court correctly

determined that no liberty interest was implicated by his placement there."). And the jail's policy of isolating high-profile inmates is reasonably related to the legitimate objective of inmate safety.

Thus, Peden's liberty interest is affected "only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time." *Earl*, 718 F.3d at 691; *Bell*, 441 U.S. at 539 n.20 (stating that while "loading a detainee with chains and shackles and throwing him in a dungeon" may preserve the security of the institution, it would be "difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish"). Peden was placed on suicide watch from 6:50 p.m. on December 3, 2017 until 4:19 p.m. on December 7, 2017, in other words, for approximately four days. (County DPFOF ¶ 28 and Pl.'s Resp. ¶ 28.) Peden argues that his placement on suicide watch was particularly harsh as he was placed in solitary confinement with a total of only one and a half hours outside of his cell and was only allowed one suicide smock, one suicide mattress, and one roll of toilet paper. ((Docket # 73 at 4, 11.)

The Seventh Circuit's decision in *Earl v. Racine County Jail* is instructive. In *Earl*, an inmate sued the Racine County Jail under § 1983, arguing that he was denied due process when he was placed on suicide watch without notice or a hearing. 718 F.3d at 690. In upholding the district court's dismissal of this claim, the court noted that while the conditions faced by an inmate on suicide watch are indeed more restrictive than ordinary prison life, the conditions are not, however, "particularly harsh compared to ordinary prison

16

life." *Id.* at 691. For example, "the only changes to meals were the trays upon which food was served (Styrofoam rather than plastic) and the quick removal of the eating utensil after each meal" and inmates were "not denied bedding but were given a mattress (or two if available) and a 'suicide-proof' blanket; inmates were denied writing materials for only the first 48 hours as a precautionary measure; and rather than prohibiting human contact, deputies were assigned to closely and personally monitor the inmates to ensure their safety." *Id.* Additionally, the court found that the length of detention was brief—"he was placed on suicide watch for only five days, which generally is too short a time to trigger due-process protection." *Id.*

While Peden attempts to distinguish the court's holding in *Earl* from his situation based on the fact that he is a pretrial detainee while the inmate in *Earl* was a convicted prisoner (Docket # 73 at 7), this distinction is not dispositive. The due process rights of pretrial detainees are "at least as great" as those protections available to a convicted prisoner. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983). Thus, Peden has failed to show that the conditions he faced on suicide watch were "particularly harsh" compared to ordinary prison life, nor has he shown that he remained subject to those conditions for a significantly long time. For these reasons, Peden's due process claim against the County fails and summary judgment is granted in favor of the County.

2    *Claims Against the City*

Peden sues the City under § 1983 in Counts One, Two, and Three for allegedly violating his right to due process, violating his Sixth Amendment right to compulsory process of witnesses, and violating his right to equal protection of law. The City moves for summary judgment in its favor as to all claims.

17

### 2.1    Claims against Rohlfing, Langley, and Lipski

As an initial matter, although Peden names Mark Rohlfing, Grant Langley, and Aaron Lipski as defendants in his complaint, Peden does not appear to bring any of his seven causes of action against any of these three defendants. In its summary judgment motion, the City Defendants move for summary judgment as to these three defendants on this basis, asserting that Peden has not pled any cognizable claims against Rohlfing, Langley, or Lipski. (Docket # 68 at 25.) Peden does not address the City Defendants' argument in his opposition brief. (Docket # 76; Docket # 91 at 2.) Because Peden's complaint alleges no causes of action against Rohlfing, Langley, or Lipski and given Peden's failure to respond to the City Defendants' argument as to this issue, summary judgment is granted in favor of defendants Rohlfing, Langley, and Lipski and they are dismissed from this case. *See Watt v. Cnty.*, 210 F. Supp. 3d 1078, 1083 (E.D. Wis. 2016) (finding party abandoned claim by failing to respond to the argument in opposition brief).

### 2.2    Section 1983 Claims Against the City

Once again, Peden alleges that the City violated his right to due process, his Sixth Amendment right to compulsory process of witnesses, and his right to equal protection of law under § 1983. (Compl. ¶¶ 86–91.) In Count One, Peden alleges that the City violated the due process clause in two ways.[1] First, he alleges the City denied Peden the assistance of counsel at each investigation session conducted by the MFD. (Compl. ¶ 87.) Second, he alleges that the City failed to have an impartial decision-maker preside over the MFD's internal investigation and render employment actions against him. (*Id.* ¶ 88.) In Count Two,

---

[1] While Peden also alleges in Count One that the City denied or delayed Peden's criminal defense counsel access to witnesses or other evidence material to his criminal case (Compl. ¶ 89), this allegation is repetitive of Count Two and more appropriately part of that claim.

18

Peden alleges that the City violated his right to compulsory process for obtaining witnesses in his favor when it pre-empted his criminal defense counsel's attempt to investigate the charges against Peden by denying counsel access to interview MFD witnesses. (*Id.* ¶ 90.) And in Count Three, Peden alleges the City denied Peden equal protection of the law by denying him legal representation in the MFD internal investigation based on his sex. (*Id.* ¶ 91.)

While the City argues in its brief for summary judgment in its favor as to Counts One, Two, and Three (Docket # 68), Peden only addresses one issue in his response brief— his allegations in Count Two that the City denied him access to witnesses. (Docket # 76 at 3–9; Docket # 91 at 2.) As above, I find Peden's failure to address the City's arguments for summary judgment in its favor as to Counts One and Three constitutes abandonment of those causes of action. *See Watt*, 210 F. Supp. 3d at 1083. Thus, summary judgment is granted in the City's favor as to these two claims.

Turning to Peden's allegations in Count Two, as stated above regarding the County defendant, while the City is a "person" under § 1983, it may only be held liable for its own Constitutional violations, not for the violations of its employees and agents. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Thus, to prevail on his § 1983 claims against the City, Peden must establish municipal liability under *Monell*. *Id.*

The Sixth Amendment gives the accused in all criminal prosecutions the right to have "compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. This right is applicable to the states through the Fourteenth Amendment, *Washington v. Texas*, 388 U.S. 14, 15 (1967), and is essential to due process, *Chambers v. Mississippi*, 410

19

U.S. 284, 294 (1973). To establish a violation of the right, a defendant must "show more than the mere absence of a witness at trial, he also 'must at least make some plausible showing of how [the absent witness's] testimony would have been both material and favorable to his defense.'" *Newell v. Hanks*, 335 F.3d 629, 633 (7th Cir. 2003) (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)); *see also Makiel v. Butler*, 782 F.3d 882, 907 (7th Cir. 2015) (finding that to establish one's right to compulsory process was violated by the exclusion of witness testimony, a plaintiff must show that: (1) the testimony would have been "both material and favorable" to his defense and (2) the exclusion was "arbitrary" or "disproportionate" to the evidentiary purposes advanced by the exclusion) (internal citations omitted).

Herein lies the glaring hole in Peden's Count Two claim—he does not contend that the City prohibited the witnesses' testimony at trial. It is undisputed that Peden's criminal defense counsel faced challenges accessing potential MFD witnesses due to the MFD's ongoing internal investigation into Peden. Recall that the MFD initially began investigating Peden in October 2017 for allegations of harassment—at this time, Assistant Chief Washington was unaware of the sexual assault allegations. (Ellis PFOF ¶ 54 and Pl.'s Resp. ¶ 54.) After Peden was arrested for sexual assault on December 2, 2017, the ADA advised the MFD not to re-interview Ellis regarding the sexual assault as it pertained to Peden's criminal charges. (PPFAF ¶ 17.) The City's counsel advised that this prohibition would put Peden's internal investigation at a stand-still, causing it to be "held open" until Peden's criminal matter concluded, as Ellis was a necessary witness in the investigation. (*Id.* ¶ 18.) But Assistant Chief Washington *did* begin re-interviewing the witnesses (except Ellis) about the sexual assault allegations. (*Id.* ¶ 19.) The MPD also interviewed MFD witnesses in April

20

and May of 2019 in conjunction with Peden's criminal investigation. (*Id.* ¶ 25.) The MFD, however, had a policy that during the course of its internal investigations, the interviewees were not allowed to discuss the investigation with anyone (except their union representative) while the investigation was pending. (*Id.* ¶ 21.)

Peden argues that this put him into a catch-22 situation where the potential witnesses could speak to law enforcement to aid the prosecution but were prohibited from speaking to defense counsel because of the ongoing internal MFD investigation. (Docket # 76 at 8–9.) Recognizing this imbalance, on June 3, 2019, Milwaukee County Circuit Court Judge Jeffrey Wagner ordered the City to "have those witnesses available for [defense] counsel," noting that "[n]ot to have them available would certainly infringe upon the due process rights of the defense while continuing your - - the city's interviews." (Affidavit of Attorney Eisberner ¶ 19, Ex. 17, Hearing Transcript from June 3, 2019 in Case No. 17-CF-5592, Docket # 82-17.) But Peden does not dispute that when the defense asked for information throughout the criminal proceedings, the information was provided pursuant to a protective order. (City DPFOF ¶ 64 and Pl.'s Resp. ¶ 64.) He does not assert that the City failed to comply with Judge Wagner's June 3, 2019 order to make the witnesses available to the defense. Rather, Peden argues that the "wall of red-tape Mr. Peden's defense counsel faced in attempting to access potentially favorable evidence at the *outset of the criminal proceedings* violated his constitutional rights and was the municipal fault of the City of Milwaukee." (Docket # 76 at 9) (emphasis added). But "[a]s long as ultimate disclosure is made before it is too late for the defendants to make use of any benefits of evidence, Due Process is satisfied." *United States v. Stott*, 245 F.3d 890, 901 (7th Cir. 2001) (quoting *United States v. Ziperstein*, 601 F.2d 281, 291 (7th Cir.1979)). For these reasons, Peden has not shown a

21

violation of his Sixth Amendment right to compulsory process. Because there is no underlying constitutional violation, the City cannot be liable under *Monell*. *See Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010). Thus, summary judgment is granted in the City's favor as to Count Two.

>  3. *Remaining State Law Claims*

In Count Five, Peden sues Ellis, the City, Washington, and Purifoy for defamation. (Compl. ¶¶ 93–103.) In Count Six, Peden sues the City, Ellis, Officer Ellis, Washington, Purifoy, and Banks for malicious prosecution. (*Id.* ¶¶ 104–12.) And in Count Seven, he sues the City, Washington, Purifoy, Ellis, and Officer Ellis for civil conspiracy. (*Id.* ¶¶ 113–20.)[2] Thus, with the dismissal of the § 1983 claims against the County and the City, all that remains are Peden's three state law claims. I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, Peden's state law claims are dismissed without prejudice, with the exception of Peden's abandoned malicious prosecution claim against the County, which is dismissed with prejudice.

## CONCLUSION

Peden brought multiple claims against the defendants under both § 1983 and Wisconsin law. All defendants moved for summary judgment in their favor. Peden abandoned several of his causes of action on summary judgment, including his first and

---

[2] The defendants are understandably confused as to whether Peden brings his civil conspiracy claim under state or federal law, as the complaint is unclear. (Docket # 58 at 14 n.8.) In opposing defendants' summary judgment motions on the civil conspiracy claims, however, Peden cites the standard for civil conspiracy under Wisconsin law and argues under Wisconsin law. (Docket # 80 at 16; Docket # 76 at 22.) Thus, it is reasonable to assume that Peden brings the civil conspiracy claim under state law.

third causes of action against the City; his sixth cause of action against the County; and his claims (if any) against defendants Rohlfing, Langley, and Lipski. Thus, summary judgment is granted in those defendants' favor as to those claims. Furthermore, I find that no rational trier of fact could find in favor of Peden as to his second cause of action against the City and his fourth cause of action against the County. As such, summary judgment is granted in the defendants' favor as to those claims. Finally, I decline to exercise supplemental jurisdiction over Peden's remaining state law claims—claim five against Ellis, the City, Washington, and Purifoy; claim six against the City, Ellis, Officer Ellis, Washington, Purifoy, and Banks; and claim seven against the City, Washington, Purifoy, and Ellis. These claims are dismissed without prejudice.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendant Ellis' motion for summary judgment (Docket # 57) is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant County of Milwaukee's motion for summary judgment (Docket # 62) is **GRANTED**.

**IT IS FURTHER ORDERED** that the City Defendants' (the City of Milwaukee, Mark A. Rohlfing, Grant F. Langley, Sharon P. Purifoy, Gerard M. Washington, Billie L. Ellis, and Raymond E. Banks) motion for summary judgment (Docket # 67) is **GRANTED**.

**IT IS FURTHER ORDERED** that Causes of Action One, Two, Three, and Four are dismissed with prejudice. Cause of Action Six against the County is dismissed with prejudice.

**IT IS FURTHER ORDERED** that Causes of Action Five, Six (against the City, Ellis, Officer Ellis, Washington, Purifoy, and Banks), and Seven are dismissed without prejudice.

**IT IS FURTHER ORDERED** that the County's motion to seal (Docket # 61) is **GRANTED**.

**FINALLY, IT IS ORDERED** that this case is dismissed. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of June, 2023.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge

24